IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs at Knoxville July 25, 2012

## STATE OF TENNESSEE v. DESHAUN JANTUAN LEWIS

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2231    Steve Dozier, Judge**

_____

**No. M2011-01220-CCA-R3-CD - Filed September 21, 2012**

_____

A Davidson County jury convicted the Defendant, Deshaun Jantuan Lewis, of one count of second degree murder, two counts of felony murder, four counts of aggravated rape, especially aggravated robbery, and making a false report to law enforcement. The trial court merged the two felony murder convictions and the second degree murder conviction into one conviction for felony murder. The trial court also merged one of the aggravated rape convictions, leaving three remaining aggravated rape convictions. The court then sentenced the Defendant to an effective sentence of life plus forty-two years in the Tennessee Department of Correction. On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions; (2) the trial court improperly allowed the State to question the Defendant about his gang involvement; and (3) his sentence is excessive. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and ROGER A. PAGE, JJ., joined.

David M. Hopkins, Nashville, Tennessee, for the appellant, Deshaun Jantuan Lewis.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; Pamela Anderson and Rachel Sobrero, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This cases arises from the robbery, rape, and murder of the eighteen-year old victim, Racquel Johnson. For his participation in these crimes, a Davidson County grand jury indicted the Defendant for first degree murder, four counts of aggravated rape, two counts of first degree felony murder, especially aggravated robbery, and making a false report to law enforcement.

## A. Trial

At a trial on these charges, the parties presented the following evidence: Maria Johnson, the victim's mother, testified that in February 2009 the victim worked full-time at the Opry Mills Mall and also attended school at Tennessee State University ("TSU"). Shortly before she was killed, the victim purchased a car, a gold Impala. Johnson recalled that the victim was "very excited" about her recent receipt of her first income tax refund and a "school refund."

Johnson testified that the last time she spoke with the victim was on Sunday, February 15, 2009, at approximately 10:00 a.m., as the victim prepared to leave for work. Johnson identified pictures of her daughter's car and items inside the car that belonged to her daughter. Johnson testified that she reported her daughter missing to police on Tuesday, February 17, 2009.

Allen C.Tatum, a Tennessee State University Police Department officer, confirmed that Johnson reported her daughter missing on February 17, 2009. Tatum used the information Johnson provided to confirm the victim's class schedule. Upon further investigation, he found that the victim had not attended any of her classes that day.

Vanessa Carver testified that she had a daughter the same age as the victim and described the victim and her daughter as "very close." Carver said that on Sunday night, February 15, 2009, at 7:16 p.m., she received a message from the victim. Carver responded, but she did not hear back from the victim. Carver described the victim as "prompt" in response to returning telephone calls, so she grew concerned when she did not hear from the victim. On February 17, 2009, Carver contacted the Metropolitan Nashville Police Department and filed a missing person report. Carver said that she learned that the victim's car had a GPS device inside it, and Carver was able to locate the victim's car at Rivergate Mall.

Carver testified that she observed "some individuals" walking out of the mall and toward the victim's car. She stopped a Goodlettsville police officer and explained that she was looking for the victim. The police officer stopped the two men who were walking toward the car and spoke with them. A third man, the Defendant, came out of the mall,

2

"walked past everyone outside and went across the parking lot, far away across the park[ing] lot and turned around and came back." When he returned, Carver spoke to the Defendant, who denied having ever been in the victim's gold Impala. He told Carver that he had come to the mall by bus, and then he walked away. Carver identified herself and the Defendant on the mall security camera footage.

Ron Longino, a Metropolitan Nashville Police Department officer, confirmed that Carver reported the victim missing and provided information about the victim's identifying features and the victim's car.

Tim Williams, a Goodlettsville Police Department officer, testified that, on February 17, 2009, he responded to a call in the parking lot of Rivergate Mall. He spoke with some of the victim's family members, who identified individuals they believed were in the victim's car. Officer Williams spoke with the two men, Brandon Campbell and Christopher Buchanan. A third man, the Defendant, refused to stop and continued to walk.

Freddie Stromatt, a Metropolitan Nashville Police Department officer, testified that early on the morning of February 20, 2009, he found the deceased victim. He explained that he responded to a shooting call at 1729 Herman Street, which he described as a duplex, residential home. When he arrived, the front door of the duplex was open. Sergeant Stromatt and another officer entered the duplex and found a partially nude body lying on the floor. Sergeant Stromatt determined the victim was deceased and contacted additional detectives to start processing a homicide investigation.

Diana McCoy, a Metropolitan Nashville Police Department officer, testified that she reported to 1729 Herman Street at 9:11 a.m. on February 20, 2009, to investigate a homicide. She described both sides of the duplex located at 1729 Herman Street as abandoned. Officer McCoy said that the interior of the duplex was littered with "debris, trash, papers, bottles, cans and things of that nature." In the front area of the duplex, there was some blood, two black "clog type" shoes, brown pants, and a visor hat. As police officers proceeded further into the duplex, there was more blood, and, in the back room of the duplex, police found the victim's body.

Officer McCoy described the victim as partially clothed with her shirt pulled up around her neck. The victim's panties and a "green cloth object" were around the victim's ankles. The victim was not wearing shoes and appeared to have been beaten around her face. At some point, Officer McCoy learned the victim had been reported missing. She contacted Detective Coleman, head of the Missing Persons Unit, and he took over the investigation.

William Kirby, a Metropolitan Nashville Police Department officer, testified that he

reported to 1729 Herman Street on the morning of February 20, 2009. After a survey of the duplex, Officer Kirby prepared a crime scene diagram of the site. Officer Kirby identified the crime scene diagram and described the basic layout of the duplex. Officer Kirby said that the duplex did not have a front door but only an "unsecured . . . storm door." He recalled that there was no furniture in the duplex, "mainly just debris." Officer Kirby said that he collected latent prints from an area of the wall above where a hole was knocked into the drywall. Officer Kirby identified a picture of blood spatter found on the wall near the victim's body. The blood spatter spanned, in height, eighteen or nineteen inches above the baseboard. Police found an Ice House beer can, a used condom, and a cable cord in the room with the victim. Next to the victim, police found a condom wrapper and a hairpiece. Officer Kirby observed a "mini blind set with the cord extended or tangled around the victim's feet, ankles." Officer Kirby observed injuries to the victim's face and neck area. One of her fingernails was broken, and the fingernails remaining on her hand were consistent with a broken fingernail found in the front room of the duplex. Used condoms were collected in the front room and the back room. The white shirt pulled up around the victim's neck was torn and the victim's knees were scratched.

Lisa Woodard testified that the Defendant is the father of her three-year old son. Woodard admitted that she had an unresolved charge for filing a false report in this case. Woodard testified that, in February of 2009, she and her son lived with her mother. She said that the Defendant often stayed overnight as well but spent his days at his mother's home. Woodard said that she knew the victim because she and the victim had gone to school together and rode the bus to work together in the afternoons. To her knowledge, the Defendant did not know the victim.

Woodard testified that she first learned of the victim's death on Friday, February 20, 2009, from the news coverage of the recovery of the victim's body at the Herman Street duplex. Woodard recounted the events of the days leading up to the discovery of the victim's body. She recalled that the Saturday night before the victim's body was found, February 14, 2009, the Defendant stayed with her at her mother's house. The next morning, Sunday, she went to church. That afternoon, she called the Defendant "several times" "just to see where he was and what he was doing." That evening, she went to see a movie with a friend. Woodard said that she spoke with the Defendant over the phone both before and after the movie. During one of these conversations, the Defendant told Woodard that he was at the "Y" with a friend, Jay Gas. At around 11:00 p.m. or 12:00 a.m., the Defendant came to Woodard's mother's house and spent the night. Woodard described the Defendant's demeanor that night as "normal." She said he "came in and grabbed a bite to eat and went to sleep." Woodard said that the Defendant slept in her room and the two engaged in sexual intercourse that night.

4

Woodard testified that over the next week, the Defendant stayed at her mother's house day and night, which was not "normal" because "normally in the morning time he would be gone." Woodard said that she "figured something was wrong" because the Defendant did not want to leave the house. Woodard said that because the Defendant did not own a car, he walked, rode the bus, or arranged for rides with his friends. On the Tuesday or Wednesday before she learned of the victim's death, Woodard and her son were at the Piggly Wiggly supermarket. Woodard called the Defendant and told him that she had bought groceries and was going to take the bus home. The Defendant told her not to take the bus because he would come and get her. Shortly thereafter, the Defendant arrived driving a gold Impala. When Woodard got into the car she noticed a pink bag in the back seat of the car. The Defendant told Woodard that the car was "his cousin's car."

Woodard testified that, at some point during the week, the Defendant's mother called and said there was someone at her home who wanted to speak with the Defendant. The Defendant left, and when he later returned, he told Woodard that he spoke with a detective who was looking for the victim. Woodard said that the Defendant appeared to be "anxious and nervous, kind of upset." Later the Defendant gave Woodard a card with Detective Coleman's name and phone number on it and asked Woodard to call the detective. The Defendant told Woodard that he wanted his "name cleared out of the whole situation," and he instructed her to tell the detective that she had seen the victim and "Chris" in the victim's car on Dickerson Pike. Woodard described her response to his request as follows:

> My first reaction was, no, I'm not going to make the call because I - - I'm realizing it was going to get me - - get me in some trouble and I figured that it was the wrong thing to do. So at first I was like, no, I'm not going to make the call. But then his face turned like bloodshot red and he was like, you got to make the call, I'm in big trouble, you need to make the call.
>
> . . . .
>
> I just kept telling him, no, I'm not going to make the call. And his main reaction was, you don't have no choice but to make the call.
>
> . . . .
>
> He just told me that if I didn't make the call he would shoot me. And I was like, I don't care, I'm not going to make the call. But he pointed [the gun] to my head."

Woodard said that she called the detective, and the Defendant kept the gun pointed at her

5

head throughout the telephone conversation.

Woodard testified that she told the detective, as the Defendant had instructed her, that she saw the victim and Chris in the victim's car on Dickerson Pike a few days ago. Woodard said that the Detective called her several more times over the next few months and asked her if she was telling the truth. During one such phone call in May, the detective told Woodard that she would be charged with filing a false report if she lied about seeing the victim on Dickerson Pike. Woodard agreed that the Defendant had been arrested and was in jail at this point, but she stated that she continued to lie because the Defendant insisted that he did not "do it." In July 2009, Woodard was arrested and charged with filing a false report.

Woodard testified that she and the Defendant were home all day on Friday, February 20, 2009. The news covered the story of the recovery of a body from the Herman Street duplex. Woodard recalled that when a picture of the house was first shown, the Defendant said, "I'll bet that's [the victim.]" She said the Defendant "got upset all at once" and "seemed real anxious and real nervous." Woodard said that the Defendant "moped around" that whole day. In the afternoon, the Defendant's mother called to tell the Defendant a detective was at her home to see the Defendant. Woodard said that upon the Defendant's learning this news, he "just ran out the house and then never came back." That night the Defendant called Woodard from jail.

On cross examination, Woodard agreed that she lied to the detective even after he gave her the opportunity to tell the truth. Woodard testified that she was arrested in July, and her bond was set at $20,000. She could not pay this bond, so she remained in jail for approximately six weeks. One day, her attorney and the detective came to visit her in jail and talked to her about the Defendant's holding a gun to her head while she made the phone call to the detective. After this meeting with her attorney and the detective, Woodard's bond was lowered to $5,000, and her mother was able to post bond for her release from jail.

Woodard agreed that the news had been reporting all throughout the week that the victim had been reported missing. Woodard further agreed that, because the victim was the only person that was reported missing at the time, she too assumed the body found at Herman Street was the victim.

Thomas Simpkins, a Metropolitan Nashville Police Department officer, testified that he processed the victim's gold Impala for evidence. Officer Simpkins identified photographs he took of the vehicle and of the driver's side floor mat. On one of the photographs, Officer Simpkins pointed out a reddish stain, consistent with blood, found on the driver's side floor mat.

6

Officer Simpkins testified that he processed various items found in the vehicle for latent fingerprints. Officer Simpkins found prints on the front hood of the car, the inside left rear door, the rearview mirror, the passenger side window, and one of the door handles. Police also found a Chips Ahoy cookie box under the front passenger seat from which Officer Simpkins found another fingerprint. The fingerprints were then submitted to the police department latent print examiner for testing.

Jacqueline Cockrill, a Police Identification Specialist II, testified as an expert in the field of latent print examination. Her assignment with the police department was to analyze latent fingerprints to determine their source. Cockrill said that she examined four sets of latent fingerprints for this case. One of the prints examined was taken from a "Chips Ahoy" box found under the driver's seat of the victim's car. These prints matched the victim's prints. Cockrill was unable to make an identification on the second set of latent prints due to the insufficient ridge detail of the prints. The next set of prints was taken from the inside of the duplex storm door and were matched to a person not involved in this case. The final set of prints was taken from the pieces of drywall from inside the duplex. One of the prints from one of the pieces of drywall matched the Defendant's palm print. Cockrill confirmed that, based upon the latent fingerprints she examined, Christoper Buchanan was excluded as a source.

Dr. Amy McMaster, a medical examiner, testified as an expert in the field of forensic pathology. Dr. McMaster performed an autopsy on the victim and described the victim as dressed in a black jacket, a white shirt, bra, underwear, and socks, with a green apron tied around her ankles. The victim's bra and shirt were torn in the front, and the shirt was stained with blood. Dr. McMaster said that the victim's facial features were distorted to such a degree that visual identification was not reliable. Dr. McMaster identified photographs of "distinctive and characteristic tattoos" on the victim's body that were used for identification purposes.

Dr. McMaster testified that there were scratches and abrasions on the victim's arms, elbows, wrists, and hands. The victim also had blunt force injuries to her head. Dr. McMaster described the victim's upper chest and face as "dark red" and "swollen." The victim's entire left cheek had a large dark red abrasion. The victim had swelling and dark bruising around both of her eyes and an abrasion on the upper surface of her right eyelid. The victim also had an ecchymosis, a large area of hemorrhaging, in her eyes which is indicative of strangulation. Dr. McMaster noted both linear and round abrasions on the left side of the victim's neck and underside of her chin with additional injuries to the left side of her cheek.

Dr. McMaster testified that the victim had a quarter-inch long laceration and bruising

7

on her upper lip consistent with blunt force trauma. Dr. McMaster identified abrasions in photographs to the victim's collarbone and shoulder areas.

Dr. McMaster testified that, based on these injuries, she conducted a neck dissection to examine the neck muscles for further signs of strangulation. The victim had two muscle groups with hemorrhages, indicative of strangulation or blunt trauma to the neck. The victim had hemorrhages in the muscles in the back of her throat and the muscles that line the spinal column. The victim also had a fracture of the hyoid bone in her neck. Dr. McMaster explained that strong pressure or a constricting force around the neck can fracture or break this bone. Dr. McMaster testified that the injuries to the neck and hyoid bone could be fatal injuries.

Dr. McMaster testified that the victim had abrasions to her hip, knees, and lower right leg. The victim had a large laceration from blunt trauma to the middle portion of her liver, indicating a strong blow to the victim's abdominal area. Dr. McMaster described this laceration of the liver as "so large that the liver was practically in two pieces." Dr. McMaster said that the most common circumstance in which she sees this degree of injury to the liver is in motor vehicle accidents due to the strong impact. Dr. McMaster testified that the volume of blood in the abdomen and bruising around the liver and diaphragm indicated that the victim was alive at the time she sustained the injury to her liver. Dr. McMaster said that, without medical treatment, the injury to the victim's liver would be fatal.

Dr. McMaster testified that she found subgaleal contusions, or bleeding, in the temporal area of the victim's scalp, which indicated blunt force trauma to the victim's head. Upon further examination, Dr. McMaster found extensive bleeding around the brain from blunt trauma. Dr. McMaster characterized the head wounds as fatal.

Dr. McMaster testified that she found bleeding in the layers of the lining of the vagina and in the deep soft tissue indicating some type of trauma. Dr. McMaster performed a sexual assault kit on the victim that included swabs of the victim's mouth, vagina, and rectum, as well as nail clippings and a hair sample.

Dr. McMaster testified that a toxicology report indicated that the active ingredient in marijuana was present in the victim's body. Dr. McMaster testified that the victim's cause of death was multiple modality injuries, meaning that multiple injuries she suffered could explain her death. Those injuries included strangulation, head trauma, and liver injury. Dr. McMaster testified that the manner of the victim's death was homicide.

On cross examination, Dr. McMaster testified that there was nothing conclusive in her examination to indicate that there was a sexual assault. She said sexual assault can occur

with the absence of injury, and injury can also occur that is not the result of a sexual assault.

Patrick Ihrie testified that, in February 2009, he worked as a special agent forensic scientist in the DNA and serology unit of the Tennessee Bureau of Investigation. Ihrie testified as an expert witness in the field of forensic DNA analysis. Ihrie said that, related to this case, he conducted a DNA analysis of a broken fingernail found at the crime scene, samples from the victim's body collected at the medical examiner's office, and used condoms. Also included among the items to be tested were DNA samples from Christopher Buchanan, Brandon Campbell, and the Defendant. The DNA profiles from the condoms recovered at the scene contained both male and female DNA but did not match the DNA profile for the victim, Christopher Buchanan, Brandon Campbell, or the Defendant. The DNA profile found on the broken fingernail recovered from the scene matched the victim's DNA profile. DNA collected from the victim's fingernails on her right hand indicated the presence of blood. Upon further testing, Ihrie found a mixture of DNA with the major contributor matching the victim. The minor contributor from this analysis could not be determined. Ihrie said that, based on the limited information for the minor contributor, he excluded Christopher Buchanan as a possible contributor.

Ihrie testified that he conducted testing on rectal swabs from the victim, which revealed the presence of a "limited number of spermatozoid or sperm cells." Upon further testing, the sperm cells were so few in number that Ihrie could not gather a DNA profile. As to the vaginal swab from the victim, Ihrie found the presence of spermatozoa, or sperm cells, and the DNA profile matched the Defendant's DNA profile. Ihrie said that he found and collected sperm from two locations on the victim's underwear. One of the samples matched the Defendant's DNA profile. The other sample was limited, but based upon the limited results, the DNA profile for the sample also matched the Defendant's DNA profile.

Hugh Coleman, a Metropolitan Nashville Police Department officer who was retired at the time of trial, testified that, in February 2009, he became involved with this case because, at that time, he oversaw all missing person reports for the police department. Coleman recalled that on Tuesday, February 17, 2009, Johnson contacted him to report her daughter missing. Johnson told Coleman that the last contact she had with the victim was late in the day on Sunday, February 15, 2009. Coleman said that he logged the information Johnson provided into the National Crime Information Center to notify all law enforcement officers across the country of the details of the missing person. Coleman also went to the victim's workplace and spoke with various employees.

Coleman testified that on February 17, 2009, a member of the Goodlettsville Police Department notified him of an incident involving the victim's car at the Rivergate Mall. Based upon this information, Coleman chose to leave the victim's car where it was found at

9

the Rivergate Mall. He explained that he did so for two reasons: (1) the car would be kept under video surveillance, and (2) the car was equipped with a GPS locator. No one attempted to move the car during the time it was under continual video surveillance. Coleman, collected a DVD from the Rivergate Mall security director, which showed the vehicle's location and three men entering and exiting the mall. During the course of the investigation, Coleman learned the names of all three men depicted in the video footage and interviewed each of them. Coleman said the three men were the Defendant, Christopher Buchanan, and Brandon Campbell.

Coleman testified that he first attempted to interview the Defendant on Wednesday, February 18, 2009. Coleman went to the Defendant's mother's house, but the Defendant was not at home. The following day, Coleman spoke with Brandon Campbell on the telephone. Coleman asked Campbell about the incident at the Rivergate Mall involving the victim's car, and Campbell was "cooperative" during their conversation. Approximately an hour later, Coleman returned to the Defendant's mother's house and spoke with the Defendant. Coleman asked the Defendant about his presence at the Rivergate Mall on Tuesday night, February 17, 2009, and also about the victim's gold Impala. The Defendant told Coleman that he rode the bus to the mall. Coleman then informed the Defendant of the video surveillance footage, and the Defendant admitted that he had ridden to the mall in the gold Impala. At this point, Coleman asked the Defendant to come to his office for further questioning, and the Defendant agreed.

Coleman testified that, once back at his office, he made an audio recording of the Defendant's statements. Coleman asked the Defendant to handwrite his statement about the gold Impala and the victim. At trial, Coleman read the Defendant's handwritten statement as follows:

> I was at the library looking for a job or on the computer when Brandon approached me and said that he just talked to Chris Buchanan and Chris was on his way to come pick him up at the library.
>
> I told Brandon that I haven't seen or heard from Chris in a minute and that that was up.
>
> I then stayed on the computer and had to get off and had to wait to get on another computer.
>
> I left the library and I seen Chris and Brandon pulling up in a gold Impala saying, what's up, n****r. Get in, come roll with us.

10

I then asked Chris who [sic] car it was and Chris just said, get in. And so I did and the next thing I know, we stopped at some apartments and Chris got some weed. And Chris and Brandon started rolling up a blunt. And then Chris said we're going to Rivergate. And the next thing I knew, I was getting me something to eat at Subway.

So I sat down and ate. And Chris and Brandon sat and talked. And I looked up from eating my sandwich and I seen Chris and Brandon having words about something and they were arguing. So Chris and Brandon started saying they were fixin' to leave. So they - - so they started walking back to the Impala and that's when the security guards grabbed them.

And I was watching them talk to the security guards and the police. I was approached by the police, did I know anything about a car or anything about some girl named Racquel and what just happened.

The police asked for my ID. I gave it to him. And he said I was good and that he was just trying to figure out what was going on and why he was driving Racquel [sic] car.

I got on the number 26 bus and headed home.

This statement was dated and signed by the Defendant. Based on inconsistencies in the investigation, Coleman decided to move the gold Impala to the police identification building where cars are processed for evidence.

Coleman testified that, on the same day he interviewed the Defendant, he interviewed both Brandon Campbell and Christopher Buchanan. Coleman also received a phone call from the Defendant's girlfriend, Woodard. Woodard told Coleman that she had seen the Defendant at the library on Tuesday, February 17, 2009, at around 5:00 p.m., and had also seen Christopher Buchanan and the victim together that day in the victim's car on Dickerson Road. Coleman said that, during the time frame Woodard claimed to have seen the gold Impala, the car was either under surveillance at the Rivergate Mall or at the police identification building. Shortly thereafter, the Defendant called to ask whether Coleman had heard from Woodard.

Coleman testified that on the morning of February 20, 2009, he learned of the crime scene at 1729 Herman Street. He went to the scene and, based upon information provided by family members and friends, "was quite certain" the body found in the house was the victim. Later in the evening of that same day, the latent print examiner notified Coleman that

11

some of the latent fingerprints recovered from the Herman Street duplex matched those of the Defendant. Based on this information, Coleman obtained an arrest warrant for the Defendant for the murder of the victim. The Defendant agreed to meet Coleman at a location near his mother's house where Coleman placed the Defendant under arrest. Thereafter, the Defendant gave a video-recorded statement, which the State played for the jury.

During this interview, the Defendant said that he met the victim approximately a year before but maintained he knew nothing about her disappearance or death. The Defendant said that the last time he spoke with the victim was when she called him on Saturday, February 14. He denied seeing the victim on Sunday, February 15, 2009, stating that the last time he saw the victim was about two weeks before when he and the victim had engaged in sex. Throughout the interview, the Defendant adamantly denied his presence or knowledge of the Herman Street duplex despite Coleman's telling the Defendant that his palm print was recovered from a piece of drywall in the Herman Street duplex. After further questioning, the Defendant admitted he had once been to the Herman Street duplex to have sex with a "white girl."

The Defendant then gave the following account of the events that occurred on Sunday, February 15, 2009. The Defendant said the victim called him and said she needed money to pay her car note. The Defendant told the victim he did not have any money. The victim told the Defendant she would pick him up at his home after she finished "handling some business." When the victim arrived at the Defendant's home, a "light-skinned" black man, unknown to the Defendant, was in the car with the victim. The victim told the Defendant, "Well, since you ain't got no money or whatever, I fittin' to make me some money." The victim drove to the Herman Street duplex where she and the man went into the duplex while the Defendant sat in the car. The man returned to the car and told the Defendant to get in the front seat. The Defendant was "curious" because the victim did not return, so he told the man that he needed to go to the bathroom. The man responded saying, "Ah, you know she not coming back out." The Defendant went inside the duplex and did not see the victim but noticed the door to the back room was closed. The Defendant walked to the door to open it when he heard the man, who was holding a gun, say, "Don't open the door." The Defendant said that he and the man returned to the car where the man told the Defendant to drive the car. The man instructed the Defendant where to drive and then indicated where to park. The man told the Defendant that the victim owed him money. The man got out of the car and told the Defendant, "You better not go over there, you better not say nothing or I'm gonna kill you." The man retrieved some items from the victim's trunk and then instructed the Defendant to drive back to the Herman Street duplex. The Defendant said that, this time, he stood by the front window in the duplex and placed his hands against the wall. The Defendant said he could not hear the victim. He opened the door to the back room and saw the victim lying on the floor with her pants off. The Defendant said he shut the door because

12

he "wasn't trying to get involved with what happened." The man then asked the Defendant what he was looking at and said "N***r, you snitch on me, I'm gonna kill you." The man then instructed the Defendant to drive him "out East." The Defendant said he parked the Impala in front of an empty house and got out of the car. The man told the Defendant to give him the car key, and then the man left.

Coleman testified that on Saturday, February 21, 2009, he attended the victim's autopsy and collected various samples taken from the victim's body and clothing for testing. Coleman said that he also obtained DNA samples from Brandon Campbell, Christopher Buchanan and the Defendant. Coleman submitted the DNA samples, the samples from the victim's body and clothing, and the used condoms and broken fingernail collected at the Herman Street duplex to the Tennessee Bureau of Investigation for comparison.

Coleman testified that on Tuesday, February 24, 2009, the Defendant left him a voice message requesting to meet with him because the Defendant had "more information." In the voicemail message, the Defendant stated that he wanted to tell Coleman "the whole story and evidence." Coleman again met with the Defendant, who drew a diagram of the crime scene. Coleman made a video recording of the interview, which the State played for the jury. During this interview, the Defendant acknowledged that he should have told police "the truth about the whole situation" from the beginning. The Defendant then stated the following:

> Now the truth is, is that me and [the victim] was friends, you know what I'm saying, but we never had any problems. Now that Sunday night, she called me . . . telling me that she wanted to get some weed. And that time when she called me she told me when she was gonna come on her way. At that time whatever, [Buchanan] had called me or whatever, and told me that they had hit a lick, you know what I'm saying. They needed a lick. A lick is something they need somebody to rob, you know what I'm saying. Okay, [Buchanan] called me and tell me who - whoever he had for 'em, and I was like man, I fittin' to go meet my gal, well she ain't my gal, but she my girl, you know what I'm saying. And he was like, "Where she, where she from?" you know what I'm saying. And I told [Buchanan], you know what I'm saying, like a little bit information about [the victim]. I told him she worked at Op-, uh, Opry Mills. I told him she had a little job and she probably just got her a little car, you know what I'm saying. And he was like, "Well she got some money?" And I was like, "she probably do," you know what I'm saying. And then he was like, "How much you think she'll have on her?" You know what I'm saying, "If we robbed her or whatever?" I was like, "S**t she'll probably have like about two or three hundred." And [Buchanan] was like, "That's what's up." And he was like, "What time y'all gonna meet up?" I told [Buchanan] what

time she said she was coming. Okay, [Buchanan], whatever on his end, he was like, "Well just call me."

. . . .

I called [Buchanan]. [Buchanan] was like, uh, "Well, where y'all gonna meet up at?" 'Cause he said he got a little spot that, you know what I'm saying, everything can go down at. That's when you asked me have I ever been over there, you know what I'm saying. And then [Buchanan] was like uh, "Just tell her to meet y'all out North or whatever," you know what I'm saying, "that we can do it out North." He didn't say who he was gonna bring with him. He just said, "Man we can do this s**t out North." He was like, "How many people gonna be with her?" I told him it was just gonna be me and her. And then [Buchanan] was like, "Alright that's what's up." He was like uh, "Make, man make sure y'all meet us out North." . . . So my thing was, was that she was gonna get robbed and everything be cool, you know what I'm saying."

The Defendant then said that the victim picked him up, and he told her they were going to buy marijuana from Buchanan. The Defendant directed the victim to the abandoned duplex on Herman Street. Once they parked, Buchanan approached the victim with a gun. The Defendant said that he "played" like he did not know Buchanan. Buchanan led the victim into the abandoned duplex at gunpoint while the Defendant "sat in the car for a few minutes." The Defendant said that Buchanan took the victim into the back room and closed the door while the Defendant waited in the front room by the window to see "if somebody was coming by." He described the debris in the duplex and the layout of the rooms and windows inside the duplex. The Defendant said that Buchanan came out of the back room and told the Defendant it was time to go. Buchanan gave the Defendant the key to the gold Impala and told the Defendant to drive.

During the video-recorded interview, the Defendant agreed that he took the victim to the Herman Street duplex to be robbed and that she "end[ed] up dead during this robbery." The Defendant said that, at some point, he saw the victim lying on the floor in the back bedroom, partially dressed. He described her shirt as ripped and her hair "all wild." The Defendant said that Buchanan took $250 from the victim. The Defendant said that, before the robbery, Buchanan told him "Whatever we get, . . . [i]t depends what we get, we'll have to deal with it." The Defendant said that, after the robbery, when Buchanan got out of the Impala, he told the Defendant, "Man just hit me up in the morning or whatever." The Defendant said that he did not "hit [Buchanan] up in the morning" but rather went to the library. Several days later when the Defendant saw Campbell in the library, Campbell asked how much the Defendant took away from the robbery, and the Defendant said that he told

14

Campbell, "I ain't got nothing yet." When asked if his portion of the robbery proceeds was the victim's car, he said that he did not "keep the Impala." He said that he got out of the car and walked to Woodard's house. The Defendant said that when he, Buchanan, and Campbell were at the mall on Tuesday, February 17, 2009, Buchanan was supposed to give the Defendant his "half."

On the video recording, the Defendant told Coleman he was concerned about the victim, but he never returned to the Herman Street duplex to check on the victim because he "was already in a crime scene," and he was "scared." The Defendant maintained that the victim was breathing when he and Buchanan left the Herman Street duplex.

Upon further questioning from Coleman, the Defendant said that he observed Buchanan and the victim struggling in the front room and then saw Buchanan take the victim into the back room. The Defendant agreed that he followed Buchanan into the back room. The Defendant described the victim as resisting, so Buchanan kicked the victim in her neck, chest, and face. The Defendant denied that anyone had sex with the victim. He told Coleman that Buchanan put the victim's pants and apron in the back room with the victim before they left, then he said that he himself placed those items in the back room. After further questioning, the Defendant said that he held the victim's feet while Buchanan tied her feet with the apron before they left.

As the interview progressed, the Defendant admitted having anal and vaginal sex with the victim. He described the incident as follows:

Defendant:   First when it all popped off she was like this how it, you know, when I came to her, she realized I was s[e]tting her up 'cause she was, I was like man Bro, you know what I'm saying, chill out chill out. 'Cause he, [Buchanan] was holding a gun to her. I told her I was like man. She said, "Why you doing this?" I was like man, I didn't say nothing and I was like man, "Just give me some head," or whatever and I said, "Everything be cool," or whatever. Okay at that time she uh gave me some head and then, you know what I'm saying, I didn't nut or whatever then at that time or whatever I was like well let me f**k. And she insist on letting me f**k because I guess she was scared and [Buchanan] had [a] gun to her so she let me f**k. At first we laid on the floor, know what I'm saying, and she, she didn't struggle or nothing she just laid there and, you know what I'm saying, and she was like, "Come on," and she let me f**k. I didn't have no condom and I did nut in her, you know what I'm

15

saying.  That's what that, that's what took place, me f\*\*cking her.

Coleman:      While [Buchanan] is holding the gun on her.

Defendant:    No [Buchanan] was just standing there like, you know what I'm saying.

Coleman:      Well I mean he's just standing there with a gun in his hand, right?

Defendant:    Yeah.

Coleman:      Okay, go ahead.

Defendant:    So I, I guess yeah, truthfully, yeah that's what made her just go by and you know just f\*\*cking me or whatever.  Even though she didn't say no she, you know what I'm saying, she went with it, you know what I'm saying.

Coleman:      Why, you know, if you're holding a gun to me, I'll light [sic].

Defendant:    Yeah, yeah, yeah.

Coleman:      Okay, go ahead.

Defendant:    Okay we f\*\*ked or whatever and then that's when everything took place.  And she was like, "Well you said nothing was gonna happen to me."  And [Buchanan] was like, "Man f\*\*k all that."  He was like, "Where the money at?"  And she was like, "I ain't got no money."  And then that's when everything went to chaos.

In the interview, the Defendant said that it was supposed to be "just a plain robbery." The Defendant said he told the victim if she cooperated and had sex with him, she would be "okay."  The Defendant explained that he did this because he began to feel "remorse" because he did not "want to kill this gal."  The Defendant said that, after they had sex, they robbed the victim.  The Defendant agreed that the victim was "beat to near death" but denied knowing that she died because she "was still breathing."  The Defendant explained that he and Buchanan tied the victim's feet before they left so he and Buchanan could "get away."

16

The Defendant admitted that, after he had sex with the victim, he hit the victim "two or three times" in the face because she was "fighting." When Coleman asked the Defendant, "You conspired, raped, murdered, [and] robbed [the victim?]," the Defendant said, "Yes sir." The Defendant said that only he and Buchanan were present during these events and that he "played a big role" in "what happened."

On cross-examination, Coleman agreed that, when the Defendant was taken into custody, he did not note any scratches on the Defendant's body or face.

The Defendant testified in his own defense that he did not kill the victim and was not in any way involved in her death. The Defendant said that he first met the victim at Opry Mills Mall approximately a year and a half before her death. He described their relationship as "just friends," although he said that he and the victim engaged in a sexual relationship and had regular contact with one another.

The Defendant testified that he spoke with the victim on the telephone on Saturday, February 14, 2009. The Defendant said the victim called him after she got off work on the following day, Sunday, February 14, 2009, and said "she wanted to chill that night." The victim was driving a gold Impala when she picked up the Defendant at his mother's house that evening. The Defendant said the victim drove to "a spot on Neil Avenue" where she parked the car and they engaged in sexual intercourse. Next, the victim drove to an abandoned duplex on Herman Street to "get some weed."

The Defendant testified that he was not involved in the arrangement to buy marijuana and had never been to the Herman Street duplex before. The victim parked the car, and when the Defendant looked over at the victim, he saw Buchanan pointing a gun at her. The Defendant said that Chris Buchanan was his "foster brother" but that he had not spoken with or seen Buchanan in "a few months or a month." The Defendant denied knowing that Buchanan was going to be outside the Herman Street duplex that night.

The Defendant testified that Buchanan ordered the victim out of the car and walked her inside the abandoned duplex. The Defendant said that, as he sat in the car trying to see "what was going on," Campbell approached him with a gun and told him to get out of the car. The Defendant said that, at that time, he had never seen Brandon Campbell before. The Defendant got out of the car, and Campbell walked the Defendant into the abandoned duplex. As soon as the Defendant entered the front door, he saw the victim on the floor with her mouth bleeding. Buchanan stood over the victim, holding the gun to her head and saying, "[B]itch come on with the money." The Defendant said that the victim was crying and telling Buchanan that she did not have any money. Campbell "made" the Defendant stand up against the wall, and the Defendant said he put his hand against the wall and looked at the

17

victim. The Defendant said he did not attempt to intervene because Campbell was pointing his gun at the Defendant, who was facing the wall. Campbell instructed the Defendant not to turn around, but the Defendant could hear "some scuffling, like fist, like rumbling." The Defendant turned around briefly and saw Buchanan hit the victim in the face. The victim leaned back, "pushed off" Buchanan and "that's when [Buchanan] grabbed the [victim's] shirt and hit her a few times and she fell and hit her head against the wall." The Defendant said he then turned back around to face the wall.

The Defendant testified that Buchanan dragged the victim, while she was kicking, to the back room of the abandoned duplex. Campbell also took the Defendant to the back room where he saw Buchanan kicking the victim in the neck and chest. The Defendant said that, when he entered the room, the victim's shirt was "pushed up," and her underwear was at her feet. The Defendant explained again that he did not attempt to intervene because Campbell was holding a gun to him and he was "scared." The Defendant said the victim stopped resisting, and Campbell ordered him to get on the ground and tie the victim's legs. The Defendant told Buchanan, "[M]an, you don't have to do this, bro, . . . man, what is y'all doing." Campbell told the Defendant to "shut up" and put the gun to the Defendant's neck. The Defendant said that he then tied the victim's legs. The Defendant described the victim as "breathing." He said that she was lying on the ground crying, with her hand over her face. The Defendant denied seeing any injuries other than her mouth bleeding.

The Defendant testified that these events lasted approximately thirty to forty minutes. Buchanan and Campbell then ordered the Defendant to leave the house and get into the back seat of the victim's car. Buchanan drove the car to an area near Jefferson Bridge and parked the car. Buchanan told the Defendant, "[B]ro, don't you say s**t about what just happened. . . . you didn't have nothing to do with this. . . . man, don't you snitch on me. . . . if you do, I know where you stay at bro, and we gonna get down like that." The Defendant said he did not respond and just got out of the car and walked to Woodard's house where he stayed for the night.

The Defendant testified that the following day, Monday, February 16, 2009, he was scared and stayed at home "for [his] safety." The Defendant said that he did not tell anyone about what he had seen happen to the victim at the Herman Street duplex but that he "wish[ed] [he] had." He said that he tried to call the victim a "few times, but it didn't show up." The Defendant denied knowing the severity of the victim's injuries that night. He acknowledged that Buchanan hit her, and her shirt was "ripped and stuff like that."

The Defendant testified that on Tuesday, February 17, 2009, he went to the library to fill out job applications on the computer. While doing so, Campbell approached him and told him that Buchanan was coming to pick up Campbell at the library and wanted to speak with

18

the Defendant. The Defendant said he did not respond, and Buchanan left. The Defendant said he attempted to access more time on a computer but was unsuccessful, so he prepared to go home. As he exited the library and walked toward the bus stop, he saw Campbell and Buchanan in the victim's car. Buchanan, who was driving the car, pulled up next to the Defendant and ordered him to get in the victim's car.

The Defendant testified that he got into the gold Impala and Buchanan drove to an apartment complex. Buchanan got out of the car and went inside an apartment and returned with "some weed." Buchanan and Campbell rolled a "blunt" while the Defendant sat in the back seat. Because Buchanan and Campbell were smoking pot, Buchanan told the Defendant to drive to Rivergate Mall. The Defendant complied and drove the three men to Rivergate Mall and parked the car. The Defendant said that Buchanan asked for the keys and the Defendant gave them to him before they all entered the Rivergate Mall. After walking around the mall, the Defendant bought some food at the food court and then sat at a table by himself while Buchanan and Campbell sat at a nearby table.

The Defendant testified that while Buchanan and Campbell were seated at the table in the food court, a man and a woman approached them and a "confrontation" ensued over the gold Impala. After this argument, the Defendant said he saw Campbell put the keys to the gold Impala in the trash can and walk toward the exit of the mall. The Defendant got up and followed Campbell and Buchanan out of the mall. When the Defendant walked outside the mall, he saw Campbell and Buchanan talking with security guards. The Defendant said, "I didn't know what was going on, what was taking place, but when I seen that, I figured it didn't have nothing to do with me." The Defendant then walked passed the security guards, Campbell and Buchanan. The Defendant said a woman approached him and asked about the gold Impala. He said that, at that time, he was unaware the victim had been reported missing. As the Defendant walked to the bus stop, he was approached by a police officer who spoke with him, and then he boarded the bus to go downtown.

The Defendant testified that over the next few days he had contact with a detective about the victim and gold Impala. The Defendant agreed that he outlined to police a plot to rob the victim, which involved Buchanan's having forcible sex with the victim and hitting her. The Defendant denied that the story was true. The Defendant explained his reasoning for lying to police about a robbery plot:

> Well, one of the reasons is because when, I already knew that me and [the victim] was in a relationship and I didn't have nothing to do with the point of her getting robbed. And then by [Buchanan] being my brother, and I knew what type of person he was, when I got locked up, and I made those statements, I was threatened and told not to say this and say that. And not to

19

implicate a person being involved. So I made statements when people came in and asked me, when [the detective] told me, that's not true, that's not, so I threw stuff in there. So I wouldn't get involved in the involvement.

The Defendant further explained that he made the statement to police due to threats from gang members in jail after he was arrested. The Defendant said that Buchanan was a gang member, and there were "homeboys" in the jail pod to which the Defendant was assigned. The Defendant said that he was testifying now because "a lot of things" had been "misunderstood" and that "it seem[ed] like" the victim's family "want[ed] justice." The Defendant further denied forcing anyone to "make up lies" for him.

On cross-examination, the Defendant denied any knowledge that Woodard was going to call Coleman and denied having a discussion with Woodard about calling Coleman. The Defendant explained that he called Coleman later that same day because he saw that Woodard had placed a call to Coleman on his cellular phone, and he wanted to confirm that it was Woodard who had placed the call. The Defendant said he did not know why Woodard told Coleman that she saw the victim and Buchanan in the gold Impala. After more questioning, the Defendant admitted that he and Woodard had a conversation about her calling Coleman to confirm that the Defendant had been at the library.

The Defendant testified that he could not recall how many times the victim was hit in the face but said it was "several." The Defendant said that Buchanan hit the victim in the face with a closed fist. The Defendant said Buchanan was wearing tennis shoes when he kicked the victim in the neck "a few times" and "stomped" the victim on her chest. The Defendant described Buchanan as grabbing the victim's shirt and then hitting the victim with his fist so the blows would be harder. While Buchanan held the victim and hit her, the victim's shirt ripped, and the victim fell back and hit her head on the wall. The Defendant denied seeing anyone choke the victim. The Defendant explained that, after Buchanan and Campbell dropped him off at the Jefferson Street Bridge, he did not call 911 anonymously to notify authorities of the victim's beating because he had been threatened.

The Defendant confirmed that when he got into the gold Impala after leaving the library on Tuesday, February 17, 2009, he did not know that it was the victim's car. He explained that he could not tell whether the car was gold or brown. The Defendant maintained that, even after he saw Buchanan and Campbell speaking with the security guards at the mall, he "didn't know what was going on." After further questioning, the Defendant admitted that after the "confrontation" in the food court and seeing the victim's family members around the gold Impala in the parking lot, he began to suspect that the family was looking for the victim.

The Defendant agreed that he was convicted of theft of property valued over $1000 in 2009. The Defendant agreed that the reason he implicated himself in these crimes during one of the initial statements to police was because of threats made by gang members affiliated with the Crips and the GDs. The Defendant said that, specifically, he was afraid of "Brandon Campbell's Rolling 60's members and Chris Buchanan, Gangster Disciple members." The Defendant said he was not afraid of the "general gang," just the members of Campbell's "crew." He then stated, "I don't know how the gang stuff go." The Defendant denied any knowledge of the unique writing of the Crip alphabet and reiterated that he was not familiar with any gang activity. The State then asked the Defendant why he was in possession of a piece of paper, upon his arrest, that contained the legend information for the Crips. The Defendant responded that he found the piece of paper on the bus "read it, but it wasn't nothing to read," so he folded it up and put it in his wallet. The Defendant said he did not recall whether the paper listed prominent murders committed by gang members and what colors gang members should wear. The Defendant agreed that, while a portion of the paper was unreadable, "major portions [could] be read in English."

Based upon this evidence, the jury convicted the Defendant of second degree murder, two counts of first degree felony murder, four counts of aggravated rape, especially aggravated robbery, and making a false report to law enforcement.

## B. Sentencing Hearing

The trial court held a sentencing hearing on the Defendant's convictions. The State submitted the presentence report, victim impact statement, and two copies of certified judgments of conviction for the Defendant as evidence for the trial court's consideration during sentencing. The judgments of conviction were for reckless aggravated assault and theft of property valued at over $1000. The Defendant received a two-year probationary sentence in both cases. The State then submitted two amended judgments for the two convictions which reflected that each of the Defendant's sentences were placed into effect as a result of a probation violation. Next, the State submitted multiple orders of adjudication finding the Defendant delinquent, as a minor, to: (1) three counts of rape; (2) burglary; and (3) theft of property valued over $500. The State also submitted a Montgomery County juvenile court order reflecting that the Defendant was adjudicated delinquent for the offense of rape on July 12, 1999.[1] Finally, the State submitted a summary letter for the Defendant's competency and insanity evaluation that indicated a potential for dishonesty.

---

[1] As further documentation of this juvenile adjudication, the State submitted Davidson County juvenile records that also reflected that the Defendant was adjudicated delinquent for the offense of rape on July 12, 1999.

Maria Johnson, the victim's mother, testified on behalf of the victim's family. Johnson described her daughter as "a goal setter," someone who loved her family, "honest" and "friendly." She stated that she had forgiven "the person that has done this horrible crime against my daughter" but asked the trial court to "punish this person to the full extent of the law and never let him out to hurt anyone else again."

After hearing the evidence, the trial court sentenced the Defendant to twenty-four years for the second degree murder conviction, twenty-two years for each of the aggravated rape convictions, twenty years for the especially aggravated robbery conviction, and five years for the making a false report to law enforcement conviction. The trial court merged one of the Defendant's convictions for aggravated rape, leaving three convictions for aggravated rape remaining. The trial court also merged the second degree murder conviction and one felony murder conviction into the remaining first degree felony murder conviction for a single conviction of first degree felony murder, for which the trial court imposed a sentence of life in prison. *See* T.C.A. § 39-13-208(c)(2010). The trial court then ordered that the aggravated rape convictions to be served concurrently with each other but consecutively to the Defendant's life sentence and ordered that the especially aggravated robbery conviction be served consecutively to both the life sentence and the sentences for the aggravated rape convictions. The sentence for making a false report to law enforcement was to be served concurrently with the life sentence for a total effective sentence of life plus forty-two years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant asserts that: (1) the evidence is insufficient to support his convictions; (2) the trial court improperly allowed the State to question the Defendant about his gang involvement; and (3) his sentence is excessive.

## A. Sufficiency of the Evidence

The Defendant argues that the evidence presented at trial is insufficient to support his convictions. The State responds that the proof supports the jury's finding of the Defendant's guilt beyond a reasonable doubt for each of his convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State*

*v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999)( (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally

insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

## 1. First Degree Felony Murder

The Defendant was convicted of second degree murder and two counts of first degree felony murder. The trial court merged these convictions for a single count of first degree felony murder. Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, or aircraft piracy." T.C.A. § 39-13-202(a)(2) (2010). In this case, the Defendant was convicted of first degree felony murder in the perpetration of both a rape (Count Six) and a robbery (Count Eight). The mental state required for these convictions was that the Defendant possessed the intent to commit the underlying offense or offenses. Rape is the unlawful sexual penetration of a victim by the defendant by force or coercion. T.C.A. § 39-13-503 (2010). Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2010).

The evidence, viewed in the light most favorable to the State, proves that the Defendant spoke with Buchanan and arranged to rob the victim at the Herman Street duplex. The victim picked the Defendant up at his mother's home in her gold Impala. The Defendant directed the victim to the abandoned Herman Street duplex under the pretense of buying drugs but with the intention of robbing her. During the course of the robbery, the Defendant told the victim that if she gave him fellatio that she would be okay. The victim performed fellatio on the Defendant while Buchanan stood nearby with a gun pointing at the victim. The Defendant was unsuccessful in ejaculating during this sex act, and he told the victim to engage in sexual intercourse with him. The victim, with the gun still pointed at her, acquiesced. The Defendant penetrated the victim both vaginally and anally and ejaculated inside of her. After these sex acts, the victim's money and car keys were taken, she was severely beaten, and her legs were tied with her apron. The Defendant left her partially clothed body lying on the floor of the abandoned duplex. The Defendant drove away in the victim's car and was seen driving the victim's car during the days following this incident.

This evidence supports a rational jury's finding that beyond a reasonable doubt the Defendant killed the victim during the perpetration of a rape and a robbery. Therefore, the evidence is sufficient to support the Defendant's convictions, and he is not entitled to relief on this issue.

## 2. Aggravated Rape

24

The jury convicted the Defendant of four counts of aggravated rape. A conviction for aggravated rape requires proof beyond a reasonable doubt that the Defendant unlawfully sexually penetrated the victim and either did so through force and coercion with a weapon, caused bodily injury, or was aided or abetted by another person and used force or coercion. *See* T.C.A. § 39-13-502 (2010). In this case, the Defendant was convicted of two counts of aggravated rape involving bodily injury and two counts of aggravated rape through force and coercion with a weapon. The trial court merged one of the counts of aggravated rape through force and coercion with a weapon into one of the counts of aggravated rape involving bodily injury for a total of three convictions of aggravated rape.

The evidence, considered in the light most favorable to the State, proved that the Defendant took the victim to the abandoned Herman Street duplex to rob her. According to the Defendant, while Buchanan held the victim at gunpoint, the Defendant told the victim to give him "head," which she did. When the Defendant did not ejaculate, he told the victim to "let him" have sex with her, and she would not be killed. The Defendant indicated that he sexually penetrated the victim both vaginally and anally while in the Herman Street duplex with Buchanan present holding a gun. Immediately afterward, the victim was robbed and "beat to near death."

Accordingly, we conclude that the evidence presented at trial, when viewed in the light most favorable to the State, was sufficient to support the jury's verdicts of guilt on all three counts of rape. The Defendant is not entitled to relief as to this issue.

### 3. Especially Aggravated Robbery

Especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" where the defendant uses a deadly weapon and causes seriously bodily injury to the victim. T.C.A. §§ 39-13-401(a), -403(a) (2010).

The evidence, considered in the light most favorable to the State, proved that the Defendant planned to rob the victim. According to the Defendant, he identified the victim as a potential source of money and planned the details of the robbery with Buchanan. The Defendant took the victim to the abandoned duplex on Herman Street where Buchanan waited and took the victim by gunpoint. The Defendant raped and beat the victim. Two hundred and fifty dollars was then taken from the victim before the Defendant fled in the victim's car. Based upon this evidence, a jury could find beyond a reasonable doubt that the Defendant was guilty of especially aggravated robbery.

The Defendant argues that there was no proof that he held a gun or that he received

proceeds of the property. First, we note that this Court has held that possession of a weapon "may be actual or constructive, exclusive or joint, where the actor does not hold the weapon but does have ready access with the power and ability to control the weapon." *State v. Billy Joe McFarland*, No. 85-157-III, 1986 WL 6563 (Tenn. Crim. App. June 10, 1986), *perm. app. denied* (Tenn. Sept. 29, 1986). The fact that, according to the Defendant's testimony, only one gun was employed does not undermine the verdict.

The Defendant's argument that he did not actually receive proceeds from the robbery is likewise unpersuasive. The Defendant admitted the intention to rob the victim with Buchanan. He took the victim to the agreed upon location and participated in the rape and beating of the victim. According to the Defendant, Buchanan took $250 from the victim. When Buchanan and the Defendant parted, Buchanan told the Defendant to contact him the following day to divide the money. The Defendant said he did not contact Buchanan but instead went to the library. The Defendant said that he met Buchanan at the mall on Tuesday, February 17, 2009, so that Buchanan could give the Defendant his portion of the robbery proceeds. The fact that the alleged parties never managed to divide the proceeds does not affect the conviction. The Defendant participated in an armed robbery of the victim where $250 was forcefully taken from the victim without her consent. Further, the Defendant was seen in the victim's car in the days following these crimes. Eventually, the Defendant abandoned the car at the Rivergate Mall after police questioned him regarding the car.

We conclude that there is sufficient evidence for a jury to find beyond a reasonable doubt that the Defendant was guilty of especially aggravated robbery of the victim. The Defendant is not entitled to relief.

### 4. False Report

Pertinent to this appeal, it is a criminal offense for a defendant to initiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern, knowing that the offense or incident did not occur or that the information relating to the offense is false. *See* T.C.A. § 39-16-502(a)(1) (2010).

The evidence, considered in the light most favorable to the State, proved that the Defendant forced Woodard at gunpoint to call Coleman and make false statements regarding the Defendant's whereabouts on Tuesday, February 17, 2009, and about seeing Buchanan and the victim in the victim's car.

One can be convicted of a crime based on the actions of another under the theory of criminal responsibility. Our current statutory criminal responsibility law is merely "a codification of the common law which provided equal criminal liability for principals,

26

accessories before the fact and aiders and abettors." *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000). One is criminally responsible for the actions of another if, "[a]cting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense." T.C.A. § 39-11-402(1) (2010). Although the Defendant did not initiate a report to the police, he caused Woodard to engage in such conduct, making him criminally responsible for her false report to law enforcement.

Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction for making a false report to law enforcement. The Defendant is not entitled to relief as to this issue.

## B. Defendant's Gang Activity and Affiliation

The Defendant argues that the trial court erred when it allowed the State to question him about his gang activity because this evidence was inadmissible character evidence. The State responds that the trial court properly admitted the evidence for the purpose of challenging the Defendant's credibility. We agree with the State.

At trial, the Defendant explained that his statement to police implicating him in the crimes was a lie. He said that he created that lie out of fear of threats made by gang members incarcerated with him. In explaining the threats, the Defendant stated, "I don't know how the gang stuff go." The Defendant later reiterated that he was not "familiar" with gang activity. The State then requested that it be able to cross-examine the Defendant about a gang legend found in the Defendant's wallet upon his arrest. Outside the presence of the jury, the trial court found that the gang legend was a proper basis for challenging the Defendant's credibility. Upon the State's questioning about the gang legend, the Defendant denied any knowledge or participation in gangs and explained that he found the piece of paper containing gang-related information while riding on the bus.

The Tennessee Rules of Evidence provide that all "relevant evidence is admissible" unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id*. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id*. at 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id*. at 403.

27

We conclude that the trial court properly allowed the questioning. Upon questioning from his attorney, the Defendant stated that he falsely implicated himself in these crimes out of his fear of gangs. Upon further questioning by the State, the Defendant stated that he was unfamiliar with gangs. We agree with the State that the Defendant's claim that he falsely admitted involvement in these crimes because of his fear of gangs and his denial of any knowledge of gangs makes his possession of the gang legend relevant to his credibility. As such, the Defendant is not entitled to relief on this issue.

## C. Sentencing

The Defendant asserts that the trial court erred when it enhanced his convictions beyond the minimum range and ordered consecutive sentencing. The State responds that the trial court properly sentenced the Defendant. We agree with the State.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts. This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration and proper weight to the factors and principles relevant to sentencing under the 1989 Sentencing Act, T.C.A. § 40-35-103 (2010), we may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994). Specific to the review of the trial court's finding enhancement and mitigating factors, "the 2005 amendments deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). The Tennessee Supreme Court continued, "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.* at 346.

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the

parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 4-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). We must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2010).

## 1. Enhancement Factors

In this case, the trial court found the following enhancement factors applicable:

(1)　　The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

　　. . . .

(7)　　The defendant, before trial or sentencing, has failed to comply with the conditions of a sentence involving release into the community;

　　. . . .

(9)　　The defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense.

　　. . . .

(16)　　The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult.

T.C.A. § 40-35-114(1), (7), (9) and (16) (2010).

The Defendant challenges the application of enhancement factor (9) to his conviction for second degree murder and his two convictions for aggravated rape involving bodily injury. The Defendant asserts that there was no evidence that he possessed or employed a firearm during the alleged offenses.

While no firearm was recovered in this case, the Defendant told police officers in his statement that a gun was employed in the commission of the rape and robbery of the victim. The jury clearly credited the Defendant's statement and found the Defendant guilty beyond a reasonable doubt of aggravated rape involving the use of a weapon and especially aggravated robbery. Accordingly, we conclude that the trial court did not err in the application of this enhancement factor in this case. The Defendant is not entitled to relief as to this issue.

### 2. Consecutive Sentencing

Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A trial court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the seven statutory factors exists. T.C.A. § 40-35-115(b)(1) - (7) (2010). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), -103(2) (2010); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court found the following consecutive sentencing criteria applicable:

(2)     The defendant is an offender whose record of criminal activity is extensive;

        . . . .

(4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

        . . . .

(6)     The defendant is sentenced for an offense committed while on probation[.]

T.C.A. § 40-35-115 (2), (4), and (6) (2010).

The Defendant asserts that the record does not support the trial court's finding that the Defendant is a "dangerous offender." The State responds that the record supports the trial

30

court's application of all three criteria. We agree with the State.

Our Supreme Court has noted that the "dangerous offender" category is the hardest and most subjective to apply. *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999). Consequently, our Supreme Court in *State v. Wilkerson* held that "particular facts" must show the following in order to base consecutive sentencing on subsection 115(b)(4): (1) that an extended sentence is necessary to protect the public against further criminal conduct by the defendant; and (2) that the consecutive sentences reasonably relate to the severity of the offenses committed. 905 S.W.2d 933, 938-39 (Tenn. 1995); *see State v. Robinson*, 146 S.W.3d 469, 524 (Tenn. 2004). In discussing the applicability of the "dangerous offender" category to the Defendant, the trial court stated the following:

> I do find under the case law and *Wilkerson* [ ], that the [D]efendant is a dangerous offender whose behavior indicates little or no regard for human life. I mean just read the record. . . . You [also] have to look at the *Wilkerson* case that deals with the aggregate term reasonably [re]lat[ing] to the severity of the offenses and is it necessary to add to [ ] the previously imposed sentence to protect the public from further serious criminal conduct[.] Well, I find those factors are present because the public has not been protected in the past from [the Defendant] in terms of attempts to deal with his criminal conduct. So something's got to stop it and the only way to do that is to keep him incarcerated.

We conclude that the evidence supports the trial court's imposition of consecutive sentences. The evidence proved that the Defendant, who had previously committed similar crimes, took the victim to a remote location for the purpose of robbing her. During the course of the robbery, the victim was raped and brutally beaten to death. The blunt force trauma to the victim's face was so severe it rendered her unrecognizable for medical identification. After the rape, beating, and robbery, the Defendant left the victim alone in the abandoned duplex and took the victim's car, which he drove for several days until he was questioned by police at Rivergate Mall. This evidence supports the trial court's finding that consecutive sentencing is necessary to protect the public and that the sentence is reasonably related to the seriousness of the offenses committed. Furthermore, the record supports the trial court's finding that the Defendant's criminal history is extensive and involves multiple other rapes, and that he committed these offenses while he was on probation for other convictions.

Accordingly, we conclude that the trial court did not err when it ordered consecutive sentencing in this case. The Defendant is not entitled to relief.

## II. Conclusion

Based on the above mentioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE